# UNITED STATES FEDERAL COURT
# SOUTHERN DISTRICT OF NEW YORK

**INDEX# 17Civ 5017 (KPF)**

Addison Thompson, Pro Se Plaintiff
255  East 7 Street #2
New York NY 10009
vs.
The United States of America
United States Postal Service (USPS)
Station Manager
149 East 23 Street
New York NY 10010-9998
United States



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/22/18

## Plaintiff's Opposition to Motion to Dismiss

### Background

In 2008 Plaintiff invited Mark (nickname Moses) to the Peter Cooper USPS, where they met for the last time. The murals were a complete surprise. Moses laughed and expressed his profound gratitude. The most unlikely American ever to be featured in USPS murals. Government instructions to the 1930's artist were to make recognizable faces; not modern or abstract. Plaintiff was a 1981 Indiana Arts Commission grant recipient to put photographic murals in 3 Muncie, Indiana social agencies. The Peter Cooper USPS was the original headquarters of the East Coast WPA and previously richly decorated with artwork. Plaintiff was familiar with the Peter Cooper USPS style of architecture from his 1993 Graham Foundation grant to photograph the Bronx Art Deco Architecture. Plaintiff was trained as a painter, then got an MFA in Photography. His work includes subtle references to the history of American Painting. Plaintiff's work innovates by virtue of its use of photographs vs. paint.

Part I: An Archaic Man Returns to the Hudson River Valley. 2008, is composed of 12 images; 1-7 panel photographic composite of 1-40 X 60 inch and 6-30 X 40 inch prints and 1-5 panel photographic composite of 1-40 X 60 inch and 4-30 X 40 inch prints. Moses pulls his boats out of hiding, takes them to the water and canoeing on the Hudson River. Interspersed with landscape photographs of the spectacular park 10 miles North of NYC, across from Yonkers, on the Hudson River. The Part I landscapes inspired the composite panoramic photographic landscape murals of Part II: Up and Down the River. 2010; for the Peter Stuyvesant USPS. Part II is composed of 13 images; 2-6 panel 40 X 60 inch composite photographic murals and a single 40 X 60 inch image. Moses invited Plaintiff to photograph his campsite and boats on the day of 9/11. The

project was in consideration for publication by *Metropolis Magazine*. When the Police closed the subway, we were forced onto 6th Avenue at 4th Street; just in time to witness the front tower fall, not knowing the back tower was already gone. In the wake of 9/11, the failure of an old promise and In the spirit of reinvention; in 2006, Plaintiff agreed to photograph Moses and his boats; on the Hudson River.

The Moses from the Bible, sacrificed his social position, his home and his religion; was forced to become self-sufficient and thereby, was a witness to the sacred reality. This Moses was an East Village neighbor to whom (as we used to say in Indiana) "God had broken the mold." In late 19th Century, the giant stone towers, across the river from the Cloisters, were being toppled and quarried. The Rockefeller family bought the land to preserve their Hudson River view. In the 1930's, WPA artists created a stone staircase down to the river. Giant Steps Park cut pathways through the rock quarry, in keeping with the Rockefeller stipulation that the land, "be kept wild and uninhabited. Moses camp site was the location to which 19 C. Albert Pinkham Ryder, would row up from Manhattan, to paint pictures of the pilots of small boats; in rough waters and other Hudson River School scenery, as a member of the *Luminist* school of Art. Part I An Archaic Man Returns to the Hudson River Valley was exhibited, in 2006, at the Rockefeller Center headquarters of Berlitz Language Centers.

Plaintiff's creation is an allegory; without images of the 9/11 event or site. The two large composites of Part II are each composed of 3 diptychs. The center diptych of Up the River shows two smashed stone towers. The solidity of stone is contrasted with the fluidity of the water. On the center diptych of Down the River: A hallucinogenic explosion of darkness and light like the bush, in the photographs, is on fire. Part I includes the human element, an ancient mythical man, (like the Sistine Chapel) complimented by Part II two contemplative panoramic wings linking heaven to earth. A public work that avoids a direct reference to its' subject. Like the new abstract white metal architectural Aids Memorial, in the West Village. Plaintiff initiated the 9/11 mural project featuring Moses, a forgotten American, as a work of public art in synch with other East Village NYC memorial sculptures, structures, gardens, murals and historical plaques.

**A cause of action**

From 2008, there were emails between the New York City USPS Regional Manager and Plaintiff in the form of a verbal agreement or contract. The agreement was Plaintiff would remove the murals, upon request. This proved unnecessary when the postal workers acknowledged the great success of Plaintiff's mural project. Which initiated Part II: Up and Down the River. being installed in the Peter Stuyvesant USPS in 2010. Plaintiff visited his murals a few times a week, to send packages as a private art dealer. The lady at Window 14 has a copy of Plaintiff's book An Archaic Man Returns to the Hudson River Valley. 2008. Presently, Paula, the new floor manager, a neighbor and family friend. She knows Plaintiff and interprets the murals weekly to requests for information from the Peter Cooper USPS customers.

In 2013, Joseph Mulvey never communicated with Plaintiff's first letter informing him of the existence of the Part II murals and Plaintiff's willingness to remove them. Mr. Mulvey had spoken at a reception to promote the new Peter Stuyvesant branch and

posted a letter in the lobby, stating the protocol for unresolved matters or circumstances, regarding the USPS relocation. Plaintiff's 2014 second letter prompted a surprise invitation, to the 23rd Street USPS, to remove the destroyed murals. Plaintiff's refusal to accept the murals, set the stage for a confrontation. Plaintiff wanted to avoid repercussions to prevent potential problems with Part I of the mural project. In 2015, Plaintiff proposed different murals to be install in the new 14th Street Postal Service Center. This was refused, but Plaintiff kept up communication in hopes the USPS would eventually acknowledge their wrong doing and facilitate the preservation of the mural project. In 2017, the USPS ceased all communication.  Only then did Plaintiff bring the VARA complaint, not to ask for damages, but to preserve his 9/11 mural project.

Plaintiff followed the court directive to work through Ms. Doud to inform the USPS of his plan to incorporate Part II of the mural project. Plaintiff worked with the concept and generated ideas to accomplish the transition. Ms. Doud actuated, facilitated and confirmed her understanding of the simple proposal to integrate Part I and Part II at the Peter Cooper USPS. In the middle of this process, the project was aborted, the plans rejected and the motion to dismiss reinitiated. May your honor witness the continued willfulness of the USPS, to refuse to admit their mistake.


**Proposal for re-incorporation.**

**IX/XI brackets**
18 X 36 inches
pine/gilt

Attached Exhibit A


**Legal Argument**

Plaintiff invokes that part of VARA which gives "the author of a work of visual art" the right to sue for damages to authority, integrity and the destruction of a work of "recognized stature". VARA recognizes that a work of art "may be incorporated in or made part of a building", and including within its' protective reach any such work that was created after its enactment on June 1, 1991, unless a written waiver was obtained from the artist. *See* 17 U.S.C. $113(d)(1) Whether a work is of "recognized stature," is "best viewed as a gate keeping mechanism." *Carter vs. Helmsley-Spear Inc.,* 861 Fsupp. 303, 315 (S.D.N.Y. 1994) *rev'd and vacated in part aff'n in part, by* 71 F.3d.77 (2d Cir. 1995). There was no written waver allowing the arbitrary destruction of the murals.

The Second Circuit's decision in Carter is the appropriate starting point.  In sum, the court explained that VARA amended existing copyright law to add protections for two "moral rights" of artists: the rights of attribution and integrity.  Moral rights are distinct from general copyrights, and they rest upon the "belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." Carter, 71 F.3d at 81.

As noted by the circuit court in Carter, the right of attribution:

generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work. Id.  The right of integrity "allows the author to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." Id. And "[i]n some [international] jurisdictions the integrity right also protects artwork from destruction." Id. By enacting VARA, Congress made the latter a federal right.  Thus, whether viewed as a subset of the right of integrity, see 17 U.S.C. § 106A(a)(3), or, as conceptualized by the circuit court in Carter, as a separate right, VARA protects against the destruction of works of visual art, but only if they are works of "recognized stature." 71 F.3d at 83 ("With numerous exceptions, VARA grants three rights: the right of attribution, the right of integrity and, in the case of works of visual art of 'recognized stature' the right to prevent destruction.").

The Second Circuit in Carter noted that VARA carved out a number of exceptions.  For example, it observed that a "work of visual art" is defined by the Act "in terms both positive (what it is) and negative (what it is not)." Id. at 83-84.  Thus, the definition includes "'a painting, drawing, print, or sculpture, existing in a single copy' or in a limited edition of 200 copies or fewer,'" but excludes "'any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audio-visual work.'" Id. at 84 (quoting 17 U.S.C. § 101).  Therefore, as explained in Carter, "Congress meant to distinguish works of visual art from other media, such as audio-visual works and motion pictures, due to the different circumstances surrounding how works of each genre are created and disseminated." Id.  Although "this concern led to a narrow definition of works of visual art," id., the Second Circuit adopted the language of the House Report that:

[t]he courts should use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition. Artists may work in a variety of media, and use any number of materials in creating their work.  Therefore, whether a particular work falls within the definition should not depend on the medium or materials used. Id. (quoting H.R.REP.NO. 514, at 11).

The circuit court also noted that for all covered works "the rights provided for endure for the life of the author or, in the case of a joint work, the life of the last surviving author," and, while they cannot be transferred, they "may be waived by a writing signed by the author." Id. at 83. Moreover, copyright registration is not required to bring a VARA infringement action, "or to secure statutory damages and attorney's fees." Id.  In that regard, "[a]ll remedies available under copyright law, other than criminal remedies, are available." Id.  What the Second Circuit did not do in Carter was to address what constitutes a  work of "recognized stature," since, unlike the district court,  it found that the particular work a very large "walk-through sculpture," installed in the lobby of a commercial building was "a work made for hire," meaning "a work prepared by an employee within the scope of his or her employment." Id. at 85. As such, it was one of the proscribed exceptions to VARA, requiring reversal for that

particular reason. The circuit court had no occasion, therefore, to determine whether the sculpture was of "recognized stature." By contrast, after having held that the work was not covered by the "work made for hire" exception, the district court did indeed conclude that the work was of "recognized stature." Its decision, therefore, marked the first time subsequent to the enactment of VARA that a court attempted to give some content and meaning to the phrase which is not defined in the statute.

The lower court in Carter perceived "recognized stature" to implicitly require the plaintiff to make a two-tiered showing: "(1) that the visual art in question has 'stature,' i.e. is viewed as meritorious, and (2) that this stature is 'recognized' by art experts, other members of the artistic community, or by some cross-section of society." 861 F. Supp. at 325. In this latter regard, the court noted that an earlier version of VARA provided that a "court or other trier of facts may take into account the opinion of artists, art dealers, collectors of fine art, and other persons involved with the creation, appreciation, history, or marketing of works of recognized sources." Id. at 325 n.10 (citations omitted). Although it believed that this provision was eliminated from VARA prior to enactment to provide courts "greater discretion with regard to what sources may be considered in determining whether a given work of visual art is a work of recognized stature," it nonetheless thought that a court "can, and should, consider these sources." Id.

The district court concluded that the plaintiffs' experts had established that the sculpture in the lobby was a work of "recognized stature" principally because (1) one of the experts, an art critic and professor of art history, testified that "this was [a] coherent ongoing program," he wanted "everyone to go and see it," the sculpture was "a work of art like almost nothing I've ever seen before," and that it "is an incredible phenomenon and I want to see it again and learn more about it;" (2) another expert, the president of the Municipal Art Society of New York, testified that the Society had organized a tour of the work and was anxious to make the work a permanent part of its tour schedule; (3) a third witness, a professor who taught two- and three-dimensional design, testified that he was "very exhilarated" by the work, "[t]he imagination of the work is tremendous," and it is "overall a very exciting piece." Id. at 325-26. He enumerated the standards, which unfortunately are not identified in the court's decision, that he used to judge whether a given work is a work of recognized stature. Although the two-tier Carter test has been referenced in a handful of subsequent cases, the Court's research has located only one circuit court and two other district courts that have substantively evaluated whether a visual art work was one of "recognized stature."

In Martin v. City of Indianapolis, 192 F.3d 608 (7th Cir. 1999), the Seventh Circuit affirmed the district court's grant of summary judgment and its award of damages for a sculpture that had been destroyed. It noted, however, that as plaintiff contended, "the Carter v. Helmsley-Spear test may be more rigorous than Congress intended." Id. at 612. But the court did not have to address the issue since it accepted as probative evidence of "stature," under the more vigorous Carter test utilized by the district court in the face of defendant's hearsay objections" certain newspaper and magazine articles, including a letter from an art gallery director and a letter to the editor of The Indianapolis News, all in support of the sculpture. Id. The circuit court also referenced a letter from the Director of Indiana University's Herron School of Art, who opined that